The STATE of Ohio, Appellee,

v.

GONSIOR, Appellant.

[Cite as *State v. Gonsior* (1996), 117 Ohio App.3d 481.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 15840.

Decided Dec. 13, 1996.

*Robert N. Farquhar*, for appellee.

*Dennis E. Gump*, for appellant.

GRADY, Judge.

John W. Gonsior appeals from his conviction for possession of drug paraphernalia, R.C. 2925.14, which was entered on his plea of no contest after the trial court overruled Gonsior's motion to suppress evidence. Gonsior was fined $250 and sentenced to serve thirty days' incarceration. The sentence was stayed by the trial court pending determination of this appeal.

The evidence which Gonsior sought to suppress, a glass pipe approximately three to four inches in length and containing a residue of burned marijuana, was found on his person in the course of a patdown search for weapons. On appeal, Gonsior argues, as he did in the trial court, that the detention which prompted the search was illegal. We agree, and on that basis we must reverse Gonsior's conviction.

On December 21, 1995, Centerville Police Officer Scott Thomas was on patrol during the evening hours in the area of Clyo Road. At approximately 10:15 p.m., he received a complaint that an automobile passing the area of the Ambridge plat had been struck by a paint ball.

At approximately 11:00 p.m., Officer Thomas was driving through the Ambridge plat when he saw a group of teenaged males gathered about a car that was parked at the curb of a street, between two residences. Two were standing outside the car and another three or four were inside. Because they were in the general vicinity from which the paint ball could have been shot, Officer Thomas decided to question them about the incident, even though he had no information identifying the person or persons who had shot the paint ball.

Officer Thomas testified that when he approached the group in his cruiser the young men standing outside "kind of turned away from me like they were surprised," and that one of them "leaned down like he was reaching inside the vehicle." Officer Thomas further stated, "I then activated my emergency lights

so I could make contact with these subjects and upon doing that I noticed a lot of movement from the occupants inside the vehicle."

Officer Thomas walked to their car and asked the young men, whom he described as seventeen or eighteen years of age, whether they lived there. They replied "no, that they were visiting a friend," and pointed toward a house two doors away. The officer was asked the following questions and gave the following responses at the suppression hearing:

"Q. When you got this, uh, when you asked this uh, question about why they were parked in the area that they were and you got the response that you did, what did you do then?

"A. Uh, based upon the fact that they appeared very suspicious to me by their movements and their answers to my questions, uh, I then asked, uh, I requested another unit to the scene to assist me, um, 'cause I felt like I needed to F.I. these subjects and uh, make sure, you know, that they had a valid reason for being where they were at. I ordered the two subjects that were standing outside the vehicle to place their hands on the car so that I could see them and all the objects, or subjects that were inside the vehicle to remain in there.

"Q. Okay. Was this done for your safety?

"A. That's correct.

"Q. Alright. And did you uh, put their hands on the, did they put their hands on the roof of the car?

"A. Yes, they placed their hands on the car."

Officer Thomas testified that he had "F.I.'d" one of the young men at another nearby location about thirty minutes before the paint ball incident. He again patted the young man down, found nothing, and then moved on to defendant Gonsior. Officer Thomas stated:

"I then proceeded to pat the defendant down for weapons, uh, and upon doing so I felt an object in his left, front coat pocket uh, that felt like a solid object three to four inches in length.

"Q. Did you ask him what it was?

"A. Uh, I asked the subject what the object was and he told me it was a lighter. I then felt the object again through the coat um, it didn't feel like a lighter and I felt another object inside his coat pocket that uh, did feel like a Bic lighter. I then asked the subject if he'd remove the object from his coat pocket and he refused.

"Q. Okay. Then what did you do?

"A. I then reached in the coat pocket to make sure that it was not a weapon and pulled the object out. Um, at that time I observed that the object was a, I believe a glass smoking device approximately three to four inches in length. It had an odor and residue to it that was consistent with burnt marijuana."

Two other aspects of Officer Thomas's testimony should be noted. First, he readily conceded that until he pulled the object from the defendant's pocket he had no idea what it was. Second, upon being asked, Officer Thomas described a paint ball gun as capable of expelling a paint ball, which bursts on impact, but he disclaimed any knowledge of how the projectile was expelled or whether the gun could be converted to shoot other objects.

Based on the evidence he found, Officer Thomas charged Gonsior with possession of drug paraphernalia.

In overruling the defendant's motion to suppress evidence, the trial court concluded:

"In view of all circumstances presented to Officer Thomas on the date and time in question, to-wit: that one police officer encountered four unidentified male subjects at approximately 11:00 p.m. on December 21, 1995, that two of the subjects were outside a parked vehicle, and that the officer observed furtive movements from all four subjects and evasive answers to his questions, the Court finds that it was reasonable for Officer Thomas to investigate further.

"The Court further finds that the security of Officer Thomas justified a pat down search for weapons of the two subjects outside of the car and the minimal intrusion to defendant which followed."

In order to determine whether the trial court correctly resolved the issue before it, whether Officer Thomas was justified in performing the patdown search which produced the evidence that Gonsior seeks to suppress, we must resolve a predicate issue: whether Officer Thomas required a legal justification to detain Gonsior and his companions when he did that. Absent that justification, the patdown cannot be supported and the evidence that it produced must be suppressed.

The protections afforded by the Fourth Amendment are not implicated in every situation of police/citizen conduct. *California v. Hodari* (1991), 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690. The test for determining whether a person has been "seized," which triggers the protections of the Fourth Amendment, is whether, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *United States v. Mendenhall* (1980), 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497. That generally occurs when the police officer has by either physical force or show of authority restrained the person's liberty, so that a reasonable person would not feel free to decline the officer's requests or otherwise to terminate the encounter. *Id.*

486

A good argument may be made that a seizure occurred under the *Mendenhall* test when Officer Thomas activated the emergency lights of his cruiser as he approached Gonsior and his companions. However, even if that "show of authority" was insufficient, the officer's request that the young men stand with their hands on their car certainly was sufficient to constitute a Fourth Amendment seizure of them per *Mendenhall*. Therefore, we must determine what legal authority Officer Thomas was required to have in order to effect that seizure.

Warrantless searches and seizures are *per se* unreasonable under the Fourth Amendment, subject to only a few well recognized exceptions. *Katz v. United States* (1967), 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576. One of those exceptions is the rule regarding investigative stops, announced in *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, which provides that a police officer may stop an individual to investigate unusual behavior, even absent a prior judicial warrant or probable cause to arrest, where the officer has a reasonable, articulable suspicion that specific criminal activity may be afoot.

An officer's inchoate hunch or suspicion will not justify an investigatory stop. Rather, justification for a particular seizure must be based upon specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant that intrusion. The facts must be judged against an objective standard: whether the facts available to the officer at the moment of seizure or search would warrant a person of reasonable caution in the belief that the action taken was appropriate. *Id.* See, also, *State v. Grayson* (1991), 72 Ohio App.3d 283, 594 N.E.2d 651.

Whether an investigative stop is reasonable must be determined from the totality of the circumstances that surround it. *State v. Freeman* (1980), 64 Ohio St.2d 291, 18 O.O.3d 472, 414 N.E.2d 1044. The totality of the circumstances are "to be viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Andrews* (1991), 57 Ohio St.3d 86, 87–88, 565 N.E.2d 1271, 1273, citing *United States v. Hall* (C.A.D.C.1976), 525 F.2d 857, 859; *State v. Freeman, supra,* at 295, 18 O.O.3d at 474–475, 414 N.E.2d at 1047.

Officer Thomas apparently judged this group of young men to be "suspicious" because of their movements when he approached and their equivocal responses to the questions that he asked. In order to create a basis in law to effect a seizure, however, the basis of an officer's suspicions requires some nexus between the individual he detains and some specific criminal conduct. Further,

that basis must be articulated by the officer or hypothesized from the totality of the facts and circumstances before him.

Here, while Gonsior and his companions were in a general area from which the paint ball could have been shot, Officer Thomas possessed no other data identifying them as the culprits. Further, the act he was investigating had occurred some thirty minutes before, rendering stale their possible connection with it. Neither their movements when Officer Thomas approached them nor their responses to his questions connote any criminal conduct or otherwise connect them with the incident the officer was investigating. Persons who are approached by police officers exhibiting a show of authority often manifest some mild degree of anxiety over their plight. Finally, whether these young men had a "valid reason" for being where they were provides no basis in law to detain them, and tends to demonstrate the weakness of the officer's reason for detaining them.

We find that the objective facts on which Officer Thomas acted rose to no more than an inchoate hunch that these young men were the culprits in the paint ball incident, if it was even that. Therefore, his detention of them to investigate that possibility was an illegal seizure under the rule of *Terry*, and as the seizure was illegal the fruits of the subsequent search of their persons must be suppressed. *Id.*

The assignment of error is sustained. The judgment of the trial court is reversed and the cause is remanded for further proceedings.

*Judgment reversed*
*and cause remanded.*

WOLFF and FREDERICK N. YOUNG, JJ., concur.