[Cite as *State v. Embry*, 2015-Ohio-193.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO.   2014-CA-30 |
| | : | |
| v. | : | T.C. NO.   13CR621 |
| | : | |
| MICHAEL EMBRY | : | (Criminal appeal from |
| | : |  Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

**O P I N I O N**

Rendered on the ___23rd___ day of ____January_____, 2015.

. . . . . . . . . .

RYAN A. SAUNDERS, Atty, Reg. No. 0091678, Assistant Prosecuting Attorney, 50 E. Columbia Street, Suite 449, Springfield, Ohio 45502
          Attorney for Plaintiff-Appellee

BRIAN A. SMITH, Atty. Reg. No. 0083620, 503 West Park Avenue, Barberton, Ohio 44203
          Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1}  This matter is before the Court on the Notice of Appeal of Michael Embry,

filed February 25, 2014. Embry appeals from his judgment entry of conviction, following a trial by jury, on one count of possession of a controlled substance, namely n-benzylpiperazine, in violation of R.C. 2925.11, a felony of the fifth degree. Embry, who had previously been convicted of a felony offense (aggravated assault), received a six month sentence. Since the police officers who seized and searched Embry lacked reasonable, articulable suspicion that criminal activity was afoot, we hereby reverse and vacate the judgment of the trial court.

{¶ 2} Embry was indicted on September 9, 2013. After pleading not guilty, Embry filed a motion to suppress on October 21, 2013. At the hearing on Embry's motion, Officer Kyle Shaffer of the Springfield Police Division testified that he has five years of experience on the police force, and that on July 7, 2013, he and his partner, Officer Tyler Elliott, were patrolling "district five" within the City of Springfield when they encountered Embry. Shaffer stated that he was in the passenger seat of the officers' marked vehicle, and that both officers were in uniform. At approximately 1:30 a.m., Shaffer testified that he and Elliott pulled into a gas station in the area of 720 East Street, entering on the west side of the lot. Shaffer testified that "there is a concrete wall on the far west wall of the gas station." According to Shaffer, "once you get to the first pumps, there was a car parked there, and the driver's side door was all the way open, so we wanted to pull through and we couldn't quite fit so we were kind of just squeezing through there." Shaffer stated that the car they observed, which turned out to be Embry's, was located on the passenger side of their vehicle as they moved forward. The following exchange occurred:

> Q. From where you were at in the vehicle describe - - could you just

describe to the Court what you were able to view?

A.   The door to the car was all the way open. There's a male in the driver's seat.   He was the only one in the vehicle.

He was kind of leaned over towards the passenger seat, kind of fumbling around or grabbing stuff; and we ended up pulling up right beside him and for awhile he didn't notice we were there.

So we were just kind of sitting there, waiting for him to close his door so we could continue on through; and then I noticed he had a clear plastic bag in his right hand.

Q.   In your experience as a police officer, what could a clear plastic bag indicate to you?

A.   In my experience the majority of street level narcotics is transported in clear plastic sandwich bags.

Q.   So at that point did that arouse your suspicion?

A.   Yes.

Q.   Could you explain to the Court how you indicated that that plastic baggy had aroused your suspicion when you saw it?

A.   He had it in one hand.   Like I said, he was kind of fumbling around on the passenger side.   I believe I exited the car and asked him what he had in his hand.   I don't think he said anything at that point. He just kind of stepped out of the vehicle.

I asked him again what he had in his hand.   He kind of kept his right hand closed down by his side and he show (sic) me his left hand but still

wouldn't show us his right hand.

Q. Based on your knowledge, training and experience would his behavior at that point arouse additional suspicions with you?

A. Yes. I would say that with his behavior, you know, I believe that he was trying to hide the narcotics from us.

Q. At that point was he under arrest or - -

A. Not that I know of.

Q. Could you explain how the interaction between the two of you went from that point when you asked him to see his hand?

A. He stepped out of the car so he was never ordered out or anything like that. Again, we just kept asking what he had in his hand. He kept it down to his side. It was closed. He kind of had the look - - He was looking around like he was scared like he didn't know what to do.

Officer Elliott ended up grabbing his right hand and telling him to open it, which he did. We observed, I believe it was green and red colored pills kind of in the shape of an octagon.

Q. Did Mr. Embry ever indicate to you what those pills were?

A. I believe he stated they were Valium.

Q. Were you able from your experience to determine whether those were, in fact, Valium while you were at the scene?

A. They looked like they were custom-type pills. They didn't look like normal pills that you would get from the drug store. They were a little bigger. Like I said they were in the shape of an octagon.

One was green, one was red. I think there was maybe two of one color and then one of the other color. There was three all together.

{¶ 3} Shaffer stated that the officers collected the pills for testing and released Embry. He stated that a warrant for Embry's arrest was issued after subsequent test results indicated that the pills were contraband.

{¶ 4} On cross-examination, Shaffer stated that the gas station was open at the time Embry was observed, and that chips, candy, pop and beer are available for purchase there. He stated that Embry's car was stopped at a gas pump. Shaffer testified that if the officers had chosen to keep moving forward in their vehicle, it "was a tight squeeze that we could have got through." Shaffer stated the baggie was of "a smaller size, possibly a sandwich baggie," that he observed "[p]robably half of the bag[gie] maybe" protruding from the top of Embry's right hand, which was closed, and that he could not see what was inside the baggie. The following exchange occurred:

Q. Would you have allowed for the possibility that when a person is leaning over in the passenger seat of the car that they are cleaning trash and things of that nature out of the passenger seat of the car; and when you get out of the car, you throw those things away?

A. Possibly, yes.

* * *

Q. And now you didn't know Mr. Embry that night, correct?

A. I don't believe I'd dealt with him at that point, no.

Q. And you didn't have any warrants for his arrest at that point in time, correct?

A. Not that we knew. We hadn't run his name through the dispatch unit.

Q. Well, other than sitting in his car having a plastic bag in his hand, Mr. Embry hadn't done anything illegal, had he?

A. No.

{¶ 5} The following exchange occurred regarding the point in time when Embry was advised of his *Miranda* rights.

Q. When you asked Mr. Embry what was in the bag that you had removed from his hand, at that point in time or just prior to that or anytime prior to that you hadn't read Mr. Embry his Miranda Warnings; is that true?

A. We read him his Miranda Warnings, I believe, after we located what was in the bag and he told us what was in the baggy.

{¶ 6} Officer Tyler Elliott testified that he has been employed as a Springfield officer for seven years. He stated that the gas station where Embry was observed is "primarily a business area. It's known for a lot of drugs and prostitution." He stated that there is a lot of foot traffic in the area. Elliott testified that he "was in the van, trying to drive between where [Embry] was parked and a concrete wall. It's actually the border of Selma Park Road." Elliott stated that Embry's car was located at the "western most pump." The following exchange occurred:

Q. At some point did you notice a baggy in Mr. Embry's hand?

A. Officer Shaffer actually brought it to my attention.

Q. And when you looked over, can you describe to the Court what you saw?

A. It was a standard sandwich bag that was clenched in the defendant's hand.

Q. And how much of that sandwich bag were you able to visualize from where you were at?

A. Probably less than a third of it.

Q. Explain to the Court what you did once Officer Shaffer pointed this out to you.

A. Yes. I got out of our patrol vehicle, and I had to walk around our patrol vehicle to get to where Mr. Embry was because I was on the driver's seat and he was on the passenger's side, so I walked around and by the time I got around, Mr. Embry was standing outside of his car.

Q. Did you say anything to him at that point?

A. I had a conversation about - - I was asking what he had in his hand.

Q. Did he respond?

A. He did.

Q. What did he say?

A. He showed me his empty - - that his left hand was empty. He showed me that and said nothing.

Q. Where was his right hand while he was doing that?

A. Down to his side, maybe behind his leg.

Q. Did that arouse your suspicions?

A. It did.

Q.   Can you explain to the Court what you did from there?

A.   I asked him a second time what was in his hand, his other hand and when he didn't want to show me, I got ahold of his wrist at which point he opened his hand up; and I could see that the bag had some pills, some strange-shaped pills I'm not used to seeing on the streets of Springfield.

Q.   Did you then seize those pills?

A.   I did.

Q.   Mr. Embry was not under arrest?

A.   He was not under arrest, but I did advise him of his Miranda Rights at that point.   He said that he understood his rights, and I spoke to him about what those pills were.

Q. Did he indicate what they were?

A.   He said there (sic) were Valium.

Q.   That turned out to be incorrect; is that right.

A.   The lab results revealed that was not accurate.

{¶ 7}  On cross-examination, consistent with Shaffer, Elliott stated that the gas station was open for business and that various items could be purchased there.  He testified that the gas station is on private property. Elliott stated that he could not see what, if anything was inside the baggie. Elliott testified that when he pulled Embry's arm up, he told him to open his hand. The following exchange occurred:

Q.   You grabbed his arm?

A.   Yes.

Q.   You pulled his arm forward?

A. Correct.

Q. You told him to open his hand?

A. Yes.

Q. And at that time you noticed there was something in the bag, correct?

A. Correct.

Q. At some point thereafter you asked him what was in the bag, correct?

A. That point being post Miranda Warning, yes.

Q. What does post Miranda Warning mean?

A. After I advised him of his Miranda Rights and he acknowledged that he understood his Miranda Rights.

Q. So your testimony then is you saw something in the bag; you read him his Miranda Warnings, and then you ask him what was in the bag?

A. That is my testimony.

{¶ 8} Embry asserts one assignment of error herein as follows:

"THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO SUPPRESS."

{¶ 9} Embry asserts that the "officers in this case did not have reasonable suspicion to conduct a stop of Appellant or to search his person." Embry asserts that at the "moment the officers approached and questioned Appellant, even before grabbing Appellant's arm and ordering him to open his hand, the approach and questioning of Appellant became a custodial interrogation." Embry asserts that the officers' testimony

regarding the point of time in the sequence of events that Embry was Mirandized is conflicting, and that "due to these contradictory accounts from the two officers, the officers' testimony should have been accordingly reduced in weight, leading to the conclusion that Appellant was Mirandized after, not before, his statement as to the baggie's contents."

{¶ 10} We note that in overruling Embry's motion to suppress, the trial court did not make findings of fact or conclusions of law.[1] The trial court's decision provides: "Upon a review of the case file, the evidentiary hearing held herein on the 26th day of November, 2013, and arguments of counsel, the Court finds, defendant's motion to suppress is not well taken and is hereby OVERRULED." Given that the detention of Embry was based merely upon his possession of a sandwich bag, at an open gas station, in a high crime area, we find the trial court's failure to provide a rationale for its decision, with citation to authority, inexplicable.

{¶ 11} As this Court has previously noted:

In a motion to suppress, the trial court assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses. *State v. Clay* (1973), 34 Ohio St.2d 250, 63 O.O.2d 391, 298 N.E.2d 137. Accordingly, in our review, we are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial

---

[1] Crim. R. 12(F) governs ruling on pretrial motions and provides "Where factual issues are involved in determining a motion, the court shall state its essential findings on the record."

court's conclusion, whether they meet the applicable legal standard. *State v. Retherford* (1994), 93 Ohio App.3d 586, 639 N.E.2d 498.

\* \* \* Encounters are consensual where the police merely approach a person in a public place, engage the person in conversation, request information, and the person is free not to answer and to walk away. *United States v. Mendenhall* (1980), 446 U.S. 544, 553, 100 S.Ct. 1870, 64 L.Ed.2d 497; *State v. Cook*, Montgomery App. No. 20427, 2004-Ohio-4793, 2004 WL 2008776. If the person's liberty is restrained by police, however, a seizure has occurred that implicates the Fourth Amendment protections and requires legal justification. *Mendenhall; State v. Gonsior* (1996), 117 Ohio App.3d 481, 690 N.E.2d 1293.

A seizure occurs when, in view of all of the circumstances surrounding the incident, the police officer has either by physical force or a show of authority restrained the person's liberty so that a reasonable person would not feel free to decline the officer's requests and walk away or otherwise terminate the encounter. *Mendenhall; State v. Williams* (1990), 51 Ohio St.3d 58, 61, 554 N.E.2d 108; *Cook*. Factors that might indicate a seizure include the threatening presence of several police officers, the display of a weapon, some physical touching of the person, the use of language or tone of voice indicating that compliance with the officer's request might be required, approaching the person in a nonpublic place, and blocking the citizen's path. *Mendenhall; Cook*.

\* \* \*

Warrantless searches and seizures are per se unreasonable under the Fourth Amendment, subject to only a few well-recognized exceptions. *Katz v. United States* (1967), 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576. One of those exceptions is the rule regarding investigative stops, announced in [*Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)], which provides that a police officer may stop an individual to investigate unusual behavior, even absent a prior judicial warrant or probable cause to arrest, where the officer has a reasonable, articulable suspicion that specific criminal activity may be afoot.

An officer's inchoate hunch or suspicion will not justify an investigatory stop. Rather, justification for a particular seizure must be based upon specific and articulable facts that, taken together with the rational inferences from those facts, reasonably warrant that intrusion. The facts must be judged against an objective standard: whether the facts available to the officer at the moment of seizure or search would warrant a person of reasonable caution in the belief that the action taken was appropriate. Id. See also *State v. Grayson* (1991), 72 Ohio App.3d 283, 594 N.E.2d 651.

Whether an investigative stop is reasonable must be determined from the totality of the circumstances that surround it. *State v. Freeman* (1980), 64 Ohio St.2d 291, 18 O.O.3d 472, 414 N.E.2d 1044. The totality of the circumstances are "to be viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they

unfold." *State v. Andrews* (1991), 57 Ohio St.3d 86, 87–88, 565 N.E.2d 1271, citing *United States v. Hall* (C.A.D.C.1976), 525 F.2d 857, 859; *Freeman*, supra, at 295, 18 O.O.3d 472, 414 N.E.2d 1044.

*State v. Cosby*, 177 Ohio App. 3d 670, 2008-Ohio-3862, 895 N.E.2d 868, ¶ 11-13, 16-18 (2d Dist.).

**{¶ 12}** Based upon the evidence adduced, we conclude that Embry was seized and searched by the officers, and that the officers' action in detaining Embry was not supported by a reasonable, articulable suspicion that criminal activity was afoot. We note that in *State v. Vaughn*, 2d Dist. Montgomery No. 25304, 2012-Ohio-6227, Hall, J., in a concurring opinion, described the common practice on the street of enclosing contraband in sandwich bags as follows: "* * * Because the volume is small, the contraband typically is placed in a corner of the plastic material, which is then tied in a knot, with the excess plastic routinely torn off. Even though the 'baggie' is of sandwich bag-like material*, it looks nothing like a zip-lock or fold-over plastic sandwich bag.*" *Id.*, ¶ 35 (emphasis added). It is clear that it was Shaffer's initial observation of the baggie in Embry's right hand, while Elliott was maneuvering the officers' vehicle alongside Embry's, which was the impetus for Embry's detention. Shaffer then brought the presence of the baggie to Elliott's attention. There was no testimony adduced as to how Shaffer was able to view the baggie, as Embry was leaning toward the passenger side of his vehicle, and the object was in Embry's right hand. In contrast to the description above, Shaffer testified that Embry held "a clear plastic bag in his right hand." On cross-examination, he described the baggie as "possibly a sandwich bag." Shaffer testified that he was unaware of the contents of the baggie; he merely stated that he could see half of the baggie

protruding from the top of Embry's hand. Similarly, Elliott testified that he observed "a standard sandwich bag" in Embry's hand, and that he could not see what, if anything, was in the baggie. Neither officer testified that the baggie was knotted, or that a portion of it had been removed.

{¶ 13} Both officers, who were in uniform, exited their marked vehicle and approached Embry in a confined space, repeatedly asking him what was in hand. Thus, we conclude that Embry's liberty was restrained by this show of authority. In other words, we cannot conclude that under these circumstances, Embry would have felt free to depart, and this conclusion is supported by the fact that Embry exited his vehicle as the officers approached him. While it was 1:30 a.m. when Embry was observed, he was on private property, and the gas station was open for business. Embry was parked at a gas pump, engaged in an activity that Shaffer acknowledged was consistent with merely removing trash from one's vehicle. Shaffer testified that Embry was doing nothing illegal, and we note that the officers were not dispatched to the area in response to a complaint about Embry or drug transactions, that Shaffer testified that he did not know Embry from past experience, and that there was no testimony that Embry appeared to be under the influence of drugs. For the foregoing reasons, we conclude that the officers were acting upon an inchoate hunch when they seized Embry and forcibly searched his hand.

{¶ 14} Further, while there was testimony from one officer, Elliott, that the area was known for drug activity, and Shaffer testified that contraband is routinely transported in baggies, we conclude that the mere presence of a "sandwich bag," in an area known for drug activity, under the totality of the circumstances herein, was not sufficient to support the officers' seizure and search of Embry. Neither officer testified that he made prior

drug-related arrests at the gas station or noted any previous drug-related arrests in the area. While Shaffer testified that Embry appeared "scared" when he stepped out of the car, nervousness is not uncommon when citizens interact with police, and Embry was being approached by two officers in uniform in a tight space.

{¶ 15} Finally, we conclude that *State v. Millerton*, 2d Dist. Montgomery No. 26209, 2015-Ohio-34, supports our decision herein. Millerton was stopped for jaywalking, and in the course of the stop, after Officer Phillips exited his cruiser, he held Millerton by the arm and conducted a pat down for officer safety, solely on the basis that the area was known to be a high crime area. *Id.*, ¶ 4. Phillips testified at the suppression hearing that there was nothing suspicious about Millerton's appearance or actions; for example he did not have bulging pockets, he did not make furtive movements, and he did not reach into his pockets or open his coat, or otherwise suggest the presence of a weapon. *Id.* Millerton was asked if he had any weapons, and he responded that he was carrying a knife and a gun. *Id.*, ¶ 5-7. The weapons were retrieved, and Millerton was arrested for carrying a concealed weapon. *Id.*, ¶ 7. This Court determined that the "facts, as found by the trial court, do not support a reasonable articulable suspicion that Millerton was armed and dangerous that would justify the necessity for a weapons check for public or officer safety. The answers to any questions asked during the pat down for weapons and the property seized were therefore tainted by the impermissible search * * *." *Id.*, ¶ 33. We conclude that just as Millerton's mere presence in a high crime area was insufficient to justify a pat down of his person for weapons in the course of a stop for jaywalking, Embry's mere possession of a "sandwich bag," while pulled up to a gas station pump in an area known for drug activity, was insufficient to justify the seizure and search of Embry.

Since the officers herein lacked a reasonable, articulable suspicion that Embry was engaged in criminal activity, the trial court erred in overruling Embry's motion to suppress, and Embry's sole assigned error is sustained. Accordingly, the judgment of the trial court is reversed and vacated.

. . . . . . . . . .

FROELICH, P.J., concurs.

HALL, J., concurring:

{¶ 16} I agree with the result reached by my colleagues, but my route thereto is somewhat different. When the two police officers approached the defendant at the open driver's door of his stopped car at the gas station island, that interaction was a consensual encounter, which did not have constitutional implications. As part of this consensual encounter, the officers saw a portion of a baggie protruding from the defendant's clenched hand. They believed it could contain narcotics which, in my view, raised a reasonable articulable suspicion sufficient for them to investigate further. When the officers asked what was in the hand, the defendant just held the clenched hand at his side or behind his leg. This perhaps added to the suspicion, but because there was no indication that what the defendant had in his hand, if anything, was a weapon, reasonable articulable suspicion did not permit grabbing the defendant's hand and telling him to open it. I do not believe the interaction rose to the level of probable cause, which would be necessary for the officers to seize the item or to arrest the defendant for any offense. Accordingly, the seizure of the defendant's arm and the contents of the baggie was not constitutionally permitted. I therefore join in the conclusion that the trial court erred in

overruling the motion to suppress and the reversal and vacation of the judgment.

. . . . . . . . . .

Copies mailed to:

Ryan A. Saunders
Brian A. Smith
Hon. Douglas M. Rastatter