[Cite as *State v. Carson*, 2015-Ohio-4110.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 26505 |
| | : | |
| v. | : | T.C. NO. 14CR369 |
| | : | |
| JEFFREY L. CARSON | : | (Criminal appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___2nd___ day of ____October____, 2015.

. . . . . . . . . .

CHRISTINA E. MAHY, Atty, Reg. No. 0092671, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

CANDI RAMBO, Atty. Reg. No. 0076627, P. O. Box 66, Springboro, Ohio 45066
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1} This matter is before the Court on the Notice of Appeal of Jeffrey Lynn Carson, filed December 8, 2014. On December 3, 2014, Carson was convicted, following his no contest plea, of one count of carrying a concealed weapon (loaded/ready at hand), in violation of R.C. 2923.12(A)(2), a felony of the fourth degree. He was sentenced to

community control sanctions for a period not to exceed five years. Carson appeals from the November 5, 2014 Decision of the trial court overruling his motion to suppress evidence. We hereby affirm the judgment of the trial court.

{¶ 2} The record reflects that Carson was initially charged on January 29, 2014 by way of Complaint in Dayton Municipal Court, and he was subsequently indicted, on February 25, 2014. After pleading not guilty, Carson filed his motion to suppress.

{¶ 3} At the September 3, 2014 hearing on Carson's motion, Officer Gary Roesser testified that he has been employed by the Dayton Police Department for nine months. According to Roesser, on January 28, 2014, at approximately 7:52 p.m., he was in uniform and on routine patrol with his partner, Officer Nathan Speelman, when he observed "a black and red SUV with excessive window tint" turn right onto Cornell Drive from Gettysburg Avenue. Roesser stated that Ohio law "requires 50 percent or less light to travel through the window, and also the law states that you must be able to observe occupants inside the vehicle." Roesser stated that he was unable to see inside the SUV and ascertain the number of occupants.

{¶ 4} Roesser stated that he "made a traffic stop as [the vehicle] turned left onto East Cornell Woods" for a window tint violation. Roesser testified that it "was extremely cold and the parking lot where I made the traffic stop was completely full of ice because most of the apartment complexes are vacant," and the parking areas are not shoveled. Roesser stated that when he "caught back up to the vehicle, it was backing into a parking spot," and he activated the lights of the cruiser. Roesser stated that when the vehicle was "backing in, we pulled straight in towards the side on the passenger's side." According to Roesser, the "driver, later identified as Jeffrey Carson, exited the driver's

seat and began to walk away from the car." Roesser testified that he "made contact with the passenger, who was opening her door and she was trying to exit. Officer Speelman, I heard him several times order Carson to stop and I could see Carson was looking around and acting very suspicious." Roesser stated that Carson did not initially comply with Speelman's order to stop, "and then he finally did comply." According to Roesser, Speelman grabbed Carson's waistband about 15 to 20 feet from the SUV and brought him back to the cruiser. Roesser testified that Speelman ordered Carson to put his hands on the cruiser.

{¶ 5} Roesser stated that he obtained identification from the passenger, and "based on the suspicious circumstances that I saw, I went over to assist Officer Speelman." At that time, "Carson had his hands on the car and Officer Speelman just started his pat down. He started on the right side of his body," according to Roesser. Roesser stated that upon feeling "a large wad," Speelman asked Carson about the contents of his pocket, and "Carson stated that it was six to $700" for his rent. As Speelman continued the pat down, Roesser stated that he observed Speelman lift Carson's coat and "immediately observed a firearm with no holster tucked into his waistband, the right side, on [Carson's] hip." Roesser stated that Speelman retrieved the weapon, and "I immediately grabbed a hold of Carson and Speelman secured the gun in his pocket." Roesser testified that the gun was loaded, and that "Carson started to tense up when we told him to put his hands behind his back." Carson then "locked his arms out and I told him that if he didn't put his hands behind his back that he would be tased, and then he complied and put his hands behind his back," according to Roesser. Roesser testified that Carson was placed in the cruiser in handcuffs, and that Speelman

advised him of his rights, after asking him if he had a permit for the weapon. Carson asked for a lawyer, according to Roesser. Roesser stated that he did not ask Carson any questions. Roesser testified that the SUV was towed from the scene. He stated that after opening the door of the vehicle, he observed that there was a third passenger in the backseat "as well. I couldn't see him because of the excessive window tint."

{¶ 6} On cross-examination, Roesser clarified his testimony that the law regarding window tint requires more than 50 percent light penetration on the side windows of a vehicle. Roesser drew a map of the area where Carson was initially observed, and he testified that at the time, Carson was heading north on Gettysburg and the officers were heading south. Roesser stated that he observed the SUV for five or six seconds before the vehicle turned right onto Cornell Drive. Roesser testified that Cornell Woods East is a street with parking spaces that are perpendicular to the curb. He stated that he pulled up "like a T" to Carson's vehicle on the passenger side. Roesser stated that he "initiated my lights as [Carson] was still backing up" into a parking space. Roesser stated that when he exited the SUV, Carson headed east away from it. Aside from the window tint violation, Roesser testified that Carson "didn't make any other traffic violations" or commit any criminal activity. Roesser stated that Carson was wearing a long coat. According to Roesser, Speelman grabbed hold of Carson's coat, along with the waistband of his pants. Roesser stated that he did not observe anything in Carson's hands. Roesser stated that there were street lights at the intersection of Cornell Drive and North Gettysburg Avenue, and in the area where Carson parked his vehicle.

{¶ 7} On re-direct examination, Roesser testified that Carson was acting in an unusual manner in that he "immediately exited the vehicle once we initiated our overhead

lights and after he did that, I heard Officer Speelman ask him to stop and he did and I looked over and * * * Carson was looking around as in looking maybe for somewhere to flee to." Roesser stated that he has made arrests in the apartment complex before, and that "90 percent of [the apartments] are vacant." He stated that some of them are "boarded up; some have boards that are down." When asked if the specific apartments in the area where Carson was stopped were boarded up, Roesser replied, "I believe those were boarded up." On recross-examination, Roesser stated that the SUV was towed because the driver was arrested, and that there was no contraband in the vehicle.

**{¶ 8}** At the conclusion of Roesser's testimony, the hearing was continued until October 31, 2014. On that date, Officer Nathan Speelman testified that he has been employed with the Dayton Police Department for almost nine years. Speelman stated that he observed Carson's SUV when "it was going to make a left-hand turn to travel east on Cornell off of North Gettysburg." According to Speelman, "as Mr. Carson made his left turn, both Officer Roesser and I noticed excessive window tint on the vehicle." Speelman stated that the "law requires that the officers can identify the occupants inside the motor vehicle," and that he could not see inside the SUV. Speelman stated that the area was well-lit by streetlights. Speelman's testimony was consistent with Roesser's regarding the character of the apartment complex, and he testified, "We've had shootings and drug transactions there in the past. * * * 95 percent of the apartments in the complete apartment buildings are actually boarded up, so we have very little traffic that goes through there these days."

**{¶ 9}** According to Speelman, Roesser parked the cruiser in "a north and south direction," and the SUV was parked in "an east and west direction." Speelman stated

that after backing into a parking space, Carson and a female passenger exited the vehicle, and that he approached the driver while Roesser ordered the female back into the vehicle. Speelman stated that Carson began walking towards Gettysburg Avenue, and that Speelman "asked him to come towards me or to stop or to come here." Carson at "some point * * * stated that he had done nothing wrong and he had parked his * * * vehicle - - so he was somewhat argumentative." Speelman testified as follows when asked about Carson's conduct:

> To me, it appeared that he was just kind of scanning or looking around. My interpretation was it looked like he wanted to run. The weather conditions were extremely deplorable that day. I think the whole apartment complex was covered in ice. It was one of the days that it was very frigid, close to zero degrees or it might have even been negative degrees at that point.

{¶ 10} Speelman stated that Carson repeatedly "declared his innocence, saying he did nothing wrong. At that point, we were closer and I asked him if he had any weapons on him that would hurt or kill me, and at that point he just asked whether or not he could just get back in his vehicle." Speelman stated that he again asked Carson about weapons, and Carson again asked to get back into the SUV. Speelman stated that at "that point, I grabbed onto him and I asked him to place his hands on top of the car. Again, I asked him if he had anything on him that would hurt or kill me and at which point he said he wanted to call his lawyer." Speelman stated that he had Carson "lace (sic) his hands on top of the hood, which would have been on the left front driver's side of the hood and began my pat down. I started on the right side. Upon touching his right front

pocket, he immediately dropped his right hand.    I felt a large amount of what turned out to be U.S. currency."   Speelman stated that he asked Carson about the contents of his pocket and that Carson told him he had "between 700 and $800 and that it was rent money."   While continuing the pat down, Speelman testified that he "felt a hard metal object on the right side of [Carson's] hip.   Again the temperatures were very frigid.   I felt a hard object on the outside of his clothing so ultimately, I went underneath his jacket to remove the firearm from his person."   Speelman stated that he immediately recognized the object as a firearm, based on his training and experience, and that he has made multiple arrests for firearms in the past. Speelman stated that Carson was wearing a heavy Carhartt-style jacket, and that they were standing on a sheet of ice.

{¶ 11}   Speelman testified as follows regarding Carson's conduct in the course of the pat down:

> I mean he was kind of tensing up.   Again, I was just trying to control him and the firearm at the same time.   I didn't want to lose my balance; I didn't want him to lose his balance.   More importantly, I didn't want the gun to come into play, so again, I had him held behind his back - - or, you know, the belt - - I don't know if he had a belt, but the center of his back where his jeans or his pants would have been, and then I had the firearm in my right hand and I was holding it back like this, and ultimately, officer Roesser was there and came around and was eventually able to secure it.

{¶ 12}   Speelman stated that the officers then placed Carson in the back of their cruiser, and that Speelman advised him of his rights by means of a card provided by the Montgomery County Prosecutor's Office.   He testified that after doing so, Carson "did not

indicate that he wanted a lawyer, and then the only pertinent question that I asked him referenced (sic) this incident was whether or not he had a CCW permit. Mr. Carson responded by saying no." Speelman stated that the other passengers were removed and the vehicle, which was registered to Carson's "sister or his girlfriend," was towed due to Carson's arrest.

{¶ 13} Speelman identified State's Exhibit 21 as "a DVR, it's marked cruiser video and it has the case number reference this case and it also has my initials dated 8/11 of 2014." He stated that the activation of the cruiser's lights initiates the video camera recording. Speelman stated that the cruiser camera constantly operates, but it does not record footage until, in this case, the lights of the cruiser are activated. He stated that the device then captures a visual recording of the previous 60 seconds prior to the activation of the lights. He stated that once the lights are activated, audio is also recorded.

{¶ 14} Speelman stated that he has watched the video, and that it is a fair and accurate representation of the officers' encounter with Carson. When asked how the video is downloaded from the cruiser camera, Speelman stated that the video "is stored internally inside the cruiser until we return to one of the districts and then at that point, then it's downloaded off the car to the district headquarters, and then eventually it goes to the main central server, which * * * is housed at the Safety Building." He stated that the videos are recorded in the ordinary course of business.

{¶ 15} On cross-examination, Speelman testified that he and Roesser were parked behind the SUV at a light before it turned left, and that he "couldn't see through the rear window." He acknowledged that the window tint statute does not apply to rear windows.

Speelman testified that Roesser parked the cruiser perpendicular to the passenger door of the SUV. Speelman stated that he conducted the pat down of Carson at the SUV. Speelman stated that Carson had a valid driver's license, and that there was nothing irregular about the SUV beyond the excessive window tint. Speelman stated that he tested the window tint on the SUV, and that Carson thereafter received a ticket for the violation. Regarding the weapon, Speelman testified that it was not holstered when he discovered it but was tucked into the waistband of Carson's pants.

{¶ 16} On redirect examination, Speelman stated that as the SUV turned left, he was able to see window tint on the side windows of the vehicle, and that he could not see the occupants inside. When asked about holding onto Carson at the SUV, Speelman testified as follows:

I mean, that's ultimately where I decided to do the pat down. I mean, his - - demeanor, his actions just, the totality of the circumstances just - - I just wanted to control his behavior. From past experiences, the best place to control a subject is to hold on by their belt or the back of their pants because I've had people slip out of coats and sweat shirts and just any type of upper garment by holding onto their back, so it's a lot easier to control their movements by holding onto them in the lower back of their jeans or whatever type of pants or shorts they might be wearing.

{¶ 17} Speelman further testified that Carson "just kind of kept looking around like he wanted to run. You know, when I asked him a question, it was I didn't do anything wrong. When I asked him about all the weapons, I want to get back in my car. When I asked him about weapons again, I want to get back in my car. Then, it's I want to talk to

my lawyer.   Those are just uncharacteristic responses to those questions."   Speelman stated that he was concerned for his safety based upon Carson's demeanor, "the way that he answered the questions, the way that he at first wanted to separate himself from the vehicle and * * * then he wanted to get back into the vehicle, so I felt that there was something more than what he was leading on to be (sic)."

{¶ 18} At the conclusion of Speelman's testimony, the court indicated that it intended to review the video and set the matter for a hearing on November 4, 2014.   On that date, the court indicated that it viewed the video and then heard brief arguments from counsel for the State and for Carson.   The court overruled the motion to suppress from the bench as follows:

> * * * It's important to point out that the Defendant, while you can see him at the beginning of the video walk to the front of the car, he's on the opposite side of * * * this SUV from where the officers are and where the camera is pointing and so the encounter between him and Officer Speelman, you can't really see. I have no reason to disbelieve Officer Speelman's account of what occurred on that side of the vehicle.
>
> I'm going to make the following findings of fact and conclusions of law.
>
> On January 28th, 2014 at approximately 7:52 p.m., officers Gary Roesser and Nathan Speelman of the Dayton Police Department were on patrol in a marked cruiser.   They were together, both wearing the uniform of the day.   You can see that in the video.
>
> It was clearly, both officers testified, very cold.   You can see in the

video, it's very icy, very snow covered. They observed a vehicle in the area of North Gettysburg near Cornell, a black and red Suburban SUV with what the officers believed to be excessive window tint, more than 50 percent tint.

They both understood that you must be able to see the occupants of the vehicle. They couldn't tell the number of occupants of the vehicle. They saw the vehicle off Gettysburg as it turned onto Cornell and both officers indicated that they could not see into the passenger compartment from the, I guess I'll call them the passenger windows, the front and the passenger windows.

They observed the vehicle pull into a parking lot in an apartment complex that is largely abandoned and boarded over, according to the officers' testimony. That vehicle, and it can be seen from the video, it actually pulls forward in the parking space and then backs up a bit. Which is about the same time that the officers turn their lights on and the Defendant can be seen, the person later identified as the Defendant gets out of the vehicle, he walks away from the vehicle towards - - from the front of the vehicle and the officers approach, ask he and a female passenger to get back into the vehicle.

First of all, Officer Roesser's been with the police department for nine months; he was with his partner Officer Speelman. Officer Speelman approached the Defendant on the driver's side. Officer Roesser appointed (sic) the female passenger on the passenger side.

Officer Speelman testified that that apartment complex is 95 percent

vacant and boarded up. He has made arrests in that area and in that large apartment complex known as Cornell Woods for shootings and drug activity.

Again, his encounter with the Defendant cannot be seen, most of it, on the driver's side of the vehicle, and quite frankly, not much of it can be heard. You can hear Officer Roesser much better.

Officer Speelman testified that he asked the Defendant to come toward him. You can hear the Defendant say, "I want to talk to my lawyer," and being argumentative. Officer Speelman testified that the Defendant's actions, he was scanning the area, he appeared to Officer Speelman to be preparing to run.

Officer Speelman then made that decision based on his concern for the area he was in, the activity the Defendant was engaged in, that is, he had walked away, he was argumentative, he wouldn't come back and he appeared to be scanning the area, attempting to run. Officer Speelman did ask him if he had any weapons on him and the Defendant kept saying, "Can I just get back in the car?"

This caused Officer Speelman to be very concerned. Again, he had to tell the Defendant several times to stop and to come back towards him. The Defendant did not comply. Officer Speelman then made the decision to pat the Defendant down, as is his practice. He holds each person he's patting down by the waistband.

He did have to bring the Defendant back to the vehicle in order to pat him down because the Defendant was walking away. The Defendant put

his hands on the vehicle. Officer Speelman began patting him down. He felt a large wad of money in the Defendant's pocket. You could hear Officer Speelman ask him about the money and the Defendant says it's for his rent.

He continued his pat down and Officer Speelman felt, and I'm going to use his words, which is, "It was a hard metal object," that he immediately recognized as a firearm. He particularly felt that - - he said it was very cold and given the weather and based upon his training and experience, he immediately recognized it as a firearm.

The Defendant was placed in a cruiser. He was Mirandized. It's my understanding, Mr. Hodge, there was no question, because the Defendant really made no statements.

MR HODGE: Correct.

*  *  *

THE COURT: * * * And while the Defendant was questioned, the Court's going to find, first of all, * * * and there was no Miranda before he was patted down, that he didn't make any statements, that the officer patted down and that's when he found the contraband.

The Defendant also, at that point in time, then tensed up. He locked his arms. You could hear him being told that he would be tased. He challenged the officers in attempting to place him into handcuffs. The vehicle was eventually towed.

They discovered a third occupant in the vehicle after the Defendant

was arrested that they couldn't even see because of the window tint.

The officers eventually did give the Defendant a ticket for the window tint. * * *

Again, I want to make this clear. It's part of my findings of fact that the Defendant was walking away from the vehicle and the lights of the cruiser, the overhead lights were already on, they were activated because you could hear the officers talking. The officers both testified that before the overhead lights are on, you will not hear audio on the recording and you could clearly hear it.

No additional contraband was found in the vehicle.

Officer Speelman testified that he was concerned for his safety because of the Defendant's behavior in walking away. He continued to look around and he was evasive and it appeared to the officer that - - he kept saying that he wanted to get back in the vehicle.

First of all, the Court is going to find that the stop of the Defendant's vehicle was authorized. The officers had observed the Defendant commit a violation of the law, that was a tint violation, and he was later given a ticket for that.

In addition the U.S. Supreme Court has indicated that unprovoked flight can arouse reasonable suspicion. While the Defendant didn't engage in flight, his walking away from the vehicle and officer Speelman's officer observation (sic) of what he believed was the Defendant scanning the area to flee is a factor for the court to consider in determining whether the officer

was authorized to pat the Defendant down.

{¶ 19} After citing *Terry v. Ohio*, the court continued at follows:

The Court is going to find, first of all, that based upon the totality of the circumstances, that a reasonably prudent person in the position of Officer Speelman would be warranted in his belief that his safety or that of others was in danger, specifically, the officers had simply attempted to stop the vehicle for a ticket.

After the lights of the cruiser were on, the Defendant walked away from that vehicle. The Officer asked him to step back into the vehicle. He behaved in a manner that led the officer to believe that he was going to flee.

In addition, the officers had made arrests there for violent offenses, gun offenses, drug offenses, that that (sic) apartment complex is, according to the officer, 95 percent abandoned and boarded up and it appeared to be a high-crime area. Based upon those factors, the Court finds that the officer had - - that a reasonably prudent person in those circumstances was warranted in the belief that his safety or that of others was in danger.

Further, the Court will find that the officer's pat down was lawful. A lawful pat down for weapons pursuant to Terry. The officer advised that the nature of the weapon was immediately apparent to him through his touch. There's no evidence that he manipulated the weapon in any manner.

And as a result, the Court will find there's no violation of the Defendant's Fourth Amendment rights and his motion to suppress will be

overruled.

{¶ 20} Carson asserts one assignment of error herein as follows:

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO SUPPRESS.

{¶ 21} Carson asserts as follows:

* * * Appellant could argue that the Officers did not have [a] valid reason to initiate a traffic stop in the first place. The Suppression Hearing transcript exposed inconsistencies in the two Officers' stories of who and when the excessive tint was discovered. (sic) In the end, evidence was presented to the Trial Court of an actual violation for excessive tint on [the] driver's side window that resulted in a citation. Therefore, the Officers' inconsistent testimony to the facts goes to their credibility more so than evidence of an unlawful stop. Now, we must look at the frisk "pat down" of Appellant. The State's burden of reasonable suspicion that the Appellant was armed to justify a frisk of the Appellant was not proven at the suppression hearing.

* * *

In the case at bar, as justification for conducting a frisk of the Appellant, Officer Speelman mentioned four reasons: 1) the fact that Appellant began to walk away from police when there has not been any evidence presented that proved Appellant was aware that the officers had initiated their overhead lights, 2) Appellant was looking around and being argumentative, 3) Arrest[s] had been made in the area in the past, and 4)

Appellant's overall demeanor. These facts do not give rise to [the] State's burden of proof of reasonable articulable suspicion.

* * *

The Appellant in the case at bar informed the Officer that he was visiting his sister that lived in the apartment complex. The Officer did not witness any possible drug transaction, or signs of drug activity by the Appellant. The Appellant did not flee, or try to avoid the Officer in anyway. A test should've been administered on the vehicle's window and a citation for traffic violation should've been issued. No evidence was presented before the Trial Court to warrant the fishing expedition that the Officer conducted on his observation "I felt that there was something more than what he was leading on to be."

In other words, it was the state's burden to show that [the] Officer had a reasonable articulable suspicion that his safety was in danger to warrant a Terry stop frisk of Appellant. The state failed to meet its burden in that respect. Appellant's seizure by Officer Speelman was conducted without a reasonable articulable suspicion of any criminal activity.

Carson directs our attention to *State v. Hawkins*, 2d Dist. Montgomery No. 25712, 2013-Ohio-5458.

**{¶ 22}** The State responds as follows:

Where Carson was stopped in a high crime area, walked away despite the police cruiser's lights being activated, ignored numerous orders to return to the vehicle, became argumentative and refused to answer the

officer's question as to whether or not he was armed, the police had reasonable suspicion to conduct a *Terry* frisk of Carson.

**{¶ 23}** As this Court has previously noted:

In regard to a motion to suppress, " 'the trial court assumes the role of trier of facts and is in the best position to resolve questions of fact and evaluate the credibility of witnesses.' " *State v. Hopfer* (1996), 112 Ohio App.3d 521, 548, 679 N.E.2d 321, quoting *State v. Venham* (1994), 96 Ohio App.3d 649, 653, 645 N.E.2d 831. The court of appeals must accept the trial court's findings of fact if they are supported by competent, credible evidence in the record. *State v. Isaac*, Montgomery App. No. 20662, 2005-Ohio-3733, citing *State v. Retherford* (1994), 93 Ohio App.3d 586, 639 N.E.2d 498. Accepting those facts as true, the appellate court must then determine, as a matter of law and without deference to the trial court's legal conclusion, whether the applicable legal standard is satisfied. *Id.*

*State v. Wilburn*, 188 Ohio App. 3d 384, 2010-Ohio-3536, 935 N.E.2d 509, ¶ 11 (2d Dist.).

**{¶ 24}** The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" As this Court has previously noted:

A seizure "implicates the Fourth Amendment protections and requires legal justification." *State v. Belcher*, 2d Dist. Montgomery No. 24385, 2011–Ohio–5015, ¶ 21, citing [*United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)]; *State v. Gonsior*, 117 Ohio App.3d 481, 690 N.E.2d 1293 (2d Dist.1996). Under the Fourth

Amendment, a warrant based on probable cause is required to effectuate a lawful search and seizure unless one of the recognized exceptions applies. *State v. Holloway*, 2d Dist. Clark No. 04CA0070, 2006–Ohio–4797, ¶ 15–16, citing *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). "One of those exceptions is the rule regarding investigative stops, announced in *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, which provides that a police officer may stop an individual to investigate unusual behavior, even absent a prior judicial warrant or probable cause to arrest, where the officer has a reasonable, articulable suspicion that specific criminal activity may be afoot." *Gonsior* at 486.

*State v. Engle*, 2d Dist. Montgomery No. 25226, 2013-Ohio-1818, ¶ 16.

**{¶ 25}** As this Court has further noted:

"Authority to conduct a patdown search for weapons does not automatically flow from a lawful stop[.]" *State v. Stewart*, 2d Dist. Montgomery No. 19961, 2004–Ohio–1319, ¶ 16. When a lawful stop is made, an officer may conduct a limited search for weapons if the officer reasonably believes the suspect may be armed. *State v. Evans*, 67 Ohio St.3d 405, 408, 618 N.E.2d 162 (1993). To justify a pat-down search, an officer must point to specific, articulable facts that create a "reasonable individualized suspicion that the suspect is armed and dangerous[.]" *State v. Roberts*, 2d Dist. Montgomery No. 23219, 2010–Ohio–300, ¶ 18. A suspect's location in a high crime area alone will not justify a weapons frisk. *Id.*

"The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry* at 27. The totality of the circumstances must "be viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Andrews*, 57 Ohio St.3d 86, 87–88, 565 N.E.2d 1271 (1991) (Citations omitted.)

*State v. Montague*, 2d Dist. Montgomery No. 25168, 2013-Ohio-811, ¶13-14.

{¶ 26} We note that the trial court found Speelman's testimony to be credible, and we defer to the trial court's credibility assessment. As this Court has previously noted, a "police officer who, based upon his observations and experience, has a reasonable, articulable suspicion that the windows on a motor vehicle are excessively tinted, may stop the vehicle for purposes of issuing a citation for excessive window tinting. * * *." *State v. Mackey*, 2d Dist. Montgomery No. 22244, 2008-Ohio-3621, ¶11. Both officers observed excessive window tint on the SUV, Carson was initially stopped and ultimately ticketed for a window tint violation, and we agree with the trial court that the stop was lawful.

{¶ 27} We have viewed the cruiser camera video, which the trial court accurately described. The video depicts Carson emerging from his vehicle and walking away after the officers activated the lights of their cruiser. This Court has concluded that "the activation of overhead flashing lights by police officers in a marked cruiser is a universally recognized signal that a motorist being followed by a police cruiser must pull over and stop, because the officer wants to talk to the motorist, or that a motorist in a stationary vehicle in the immediate vicinity of the cruiser should not leave the area, but wait, because

the police officer wants to talk to the motorist." *State v. Little*, 2d Dist. Clark No. 09-CA-122, 2010-Ohio-2923, ¶9. This Court has further held that "it is permissible for a police officer to ask someone stopped for a traffic violation if he is armed, even absent a reasonable suspicion that the person is armed and presents a danger to the officer or others. * * *." *State v. Brown*, 2d Dist. Montgomery No. 25204, 2012-Ohio-5532, ¶ 11. "Although any search for weapons must be based on reasonable, articulable suspicion that a weapon is present, 'a simple inquiry as to whether the person stopped has a weapon is not a search or a seizure.' * * *." *Id.*

{¶ 28} Speelman testified that he repeatedly asked Carson if he was armed and that Carson did not answer his questions. Further, Carson was argumentative, and his conduct in scanning the area suggested to Speelman, an experienced officer, that Carson was about to flee. The area of the stop is largely abandoned, and Speelman was aware of past arrests there for drug activity and violent offenses involving weapons. Speelman specifically testified that he was concerned for his safety and that of Roesser, and we conclude that, based upon the totality of the circumstances described above, a reasonably prudent officer would be warranted in the belief that his safety or that of others was in danger. Finally, we find that Carson's reliance upon *Hawkins* is misplaced. Therein, this Court reversed the judgment of the trial court overruling Hawkins' motion to suppress, finding that the detention of Hawkins, who was merely walking with another man in an area experiencing high drug activity, but doing nothing otherwise suspicious, was unlawful, and that the subsequent pat down of Hawkins was not supported by reasonable suspicion that he was armed. Unlike Hawkins, Carson was lawfully stopped for a window tint violation, and his subsequent conduct supported a reasonable suspicion

that he was armed.   There being no merit to Carson's assigned error, it is overruled.

The judgment of the trial court is affirmed.

. . . . . . . . . .

FAIN, J. and HALL, J., concur.

Copies mailed to:

Christina E. Mahy
Candi Rambo
Hon. Mary Katherine Huffman